WILLIAM F. BEHRMANN, as Substituted Trustee under the Trust Agreement of FANNIE CLARKSON with DANIEL E. SEYBEL, Appellant, v. FREDERICK W. SEYBEL and WILLIAM A. KNAPP, as Executors, etc., of DANIEL E. SEYBEL, Deceased, and Others, Respondents.

First Department, July 13, 1917.

Fraud — trust — assignment by trustee of bond and mortgage — consideration — rights of purchaser without notice of prior equitable rights — maxim — where equities are equal the law shall prevail.

A law firm engaged in loaning money on bond and mortgage and purchasing and selling real estate and securities formed a mortgage company and whenever it purchased property for clients title thereto was taken in the name of said company, the latter issuing at the time certificates showing the interest of the clients in the particular property. A client gave to a member of the firm cash and securities including a bond and mortgage in trust to invest and reinvest the same and with power to sell. The mortgage company to which said mortgage had been made executed and issued to the member of the firm as trustee for the client a certificate stating that it had sold the bond and mortgage to said member, as trustee for the client, and agreeing upon the surrender of said certificate to deliver an assignment, but the assignment was never executed and interest was paid by the firm to the client. Thereafter, the member of the firm caused the mortgage company to execute and deliver a similar certificate to a second client who had money on deposit with the firm for investment and the account of said client with the firm was charged with the value of the bond and mortgage and the firm member's account as trustee of the first client was credited with the same amount. Thereafter the second client decided to transfer her account to a trust company, and the mortgage company executed and delivered an assignment of the bond and mortgage to said client which was turned over to the trust company.

Held, on all the evidence, that the second client paid a valuable consideration for the assignment of the bond and mortgage and has a right to retain them as against the first client;

That the first client is entitled to recover from the executors of the partner her share in another mortgage held by said partner, and that said share shall be assigned by the mortgage company to the purchaser thereof.

A cestui que trust is not to be debarred from following property which her trustee has stolen or given away without consideration merely because by appointing him trustee she placed him in a position to defraud her.

A purchaser for a valuable consideration, without notice of a prior equitable right, obtaining the real estate at the time of his purchase is entitled

to priority in equity as well as at law, according to the well-known maxim that where the equities are equal the law shall prevail.

SCOTT, J., and CLARKE, P. J., dissented in part, with opinion; SHEARN, J., dissented in part, with opinion.

APPEAL by the plaintiff, William F. Behrmann, as substituted trustee, from a judgment of the Supreme Court in favor of the defendants, entered in the office of the clerk of the county of Bronx on the 17th day of July, 1916, upon the decision of the court after a trial before the court without a jury.

*William A. Keating,* for the appellant.

*Ira B. Stewart,* for the respondent Union Trust Company of New York, as executor, etc.

*Eliot Tuckerman,* for the respondent Alexander M. Welch, as executor, etc.

DAVIS, J.:

This action is brought, *first,* to compel an accounting by the executors of Daniel E. Seybel, for the purpose of ascertaining the amount of money justly and equitably due to the plaintiff from the estate of Daniel E. Seybel; *second,* to compel the defendant Union Trust Company, as executor of Mary J. Alker to assign to the plaintiff a certain bond and mortgage for $6,000 made by Leon Noel to the Park Mortgage Company, and for a judgment decreeing that the defendant Park Mortgage Company pay to the plaintiff such part of the $6,000 as would represent that part of the mortgage which the executor of Mary J. Alker failed to transfer to the plaintiff; *third,* to compel the Park Mortgage Company to assign to the plaintiff $200 of the mortgage of John Kitson Wright and wife, made to the Park Mortgage Company, and *fourth,* to trace the moneys alleged to belong to the plaintiff for the purpose of declaring that the property represented by the money be impressed with a trust in behalf of the plaintiff.

The court at Special Term dismissed the complaint against the executor of Mary J. Alker, and the defendant Welch, as executor, on the merits and rendered judgment in favor

of William F. Behrmann, as substituted trustee of Fannie Clarkson, against the executors of Seybel for $6,000, and for the further sum of $200, which latter amount was the consideration received by Seybel from the Dyckman estate for the purchase of Fannie Clarkson's share of the Wright mortgage. The judgment also directed that the defendant Park Mortgage Company execute and deliver to the defendant Welch, executor of Isaac M. Dyckman, an assignment of the $200 interest in the Wright mortgage.

Daniel E. Seybel, for some time prior to 1910, was a member of the law firm of Silkman, Fettretch & Seybel. This firm did a large business in the purchase and sale of real estate, loans of money on bond and mortgage, and in purchasing and selling bonds and mortgages. An important part of their business consisted in investing the moneys of clients intrusted to it for that purpose. In order to carry on the business most conveniently for themselves and their clients, the firm organized the Park Mortgage Company. Whenever it purchased real estate or mortgages for clients, the title thereof was taken in the name of the Park Mortgage Company, the latter issuing at the time certificates showing the interest of the clients in the particular property. The corporation was in the absolute control of the members of the firm, they being the officers and directors, and Seybel being the controlling member of the corporation. The corporation kept no bank account and had no money of its own, nor did it keep any books. The moneys of the clients were kept in the firm's bank account and the transactions with the clients were recorded in the firm's books, and statements of the transactions were rendered to the clients in the firm name. The ownership of the various mortgages was shown in a book kept by the firm and known as the mortgage book. In this book were entered the names of the owners of the mortgages with a full description of the security.

Silkman died in 1910 and the business was continued by the new firm of Fettretch & Seybel. Fettretch having died in 1912, the business went on with the new firm of Seybel & French and was continued by that firm until the death of Seybel, on May 4, 1915.

The plaintiff Fannie Clarkson, now Mrs. Behrmann,

and Mary J. Alker were both clients of Seybel's firm and each intrusted to it money for investment. Mr. Seybel had full charge of these investments, and it was he who decided into what securities the money should be placed.

The claim of the plaintiff has its origin in the following circumstances: Seybel had been executor of the estate of James Clarkson, deceased, who was the father of the plaintiff. In June, 1911, Seybel, through the American Audit Company, prepared an account of his proceedings as said executor and submitted it to the plaintiff for her examination and approval. Having examined the account she executed and acknowledged a receipt and release by the terms of which she acknowledged the receipt from Daniel E. Seybel of $7,343.58 in cash and securities in full payment and satisfaction of her one-fifth share of the residue of the estate of her father. This receipt states that it is taken as a full discharge of Seybel to account and that she had examined the account, covering a period from September 7, 1893, down to and including June 1, 1911.

Simultaneously with the execution of the receipt and release Fannie Clarkson executed an instrument giving and granting unto Seybel and his successors, $7,000 in cash and securities, in trust, to invest and reinvest the same upon bond and mortgage, upon property in the State of New York, and upon such other securities as trustees are permitted to invest in under the laws of the State of New York. Seybel was also authorized to receive the rents, income and profits from such investments and to pay over the net amount to Fannie Clarkson during her life. At her death the principal sum or the securities remaining in his hands were to be given to such persons as she might appoint by her last will. The instrument then provides for the disposition of this fund in case Miss Clarkson made no appointment by will. The instrument also empowers Seybel and his successors to sell and convey any real property which may be purchased by him upon the foreclosure of any mortgage investment and to give and deliver deeds thereof.

Among the assets appearing in Seybel's account of proceedings as executor of Miss Clarkson's father, was the bond and mortgage of Leon Noel for $6,000. It represented part

of the $7,343.58 belonging to Fannie Clarkson as her share of her father's estate. It was, therefore, part of the trust fund passing to Seybel under the deed of trust. The mortgage in question was made by Leon Noel to the Park Mortgage Company in 1904. On the same date that the deed of trust was executed, the Park Mortgage Company executed and issued to Seybel, as trustee for Fannie Clarkson, a certificate stating that it had sold to Daniel E. Seybel, as trustee for Fannie Clarkson, the Noel bond and mortgage for $6,000, and agreeing that, upon the surrender of the certificate and on demand of the person entitled to the bond and mortgage, it would deliver an assignment of the bond and mortgage. This certificate was signed by " Park Mortgage Company, by Daniel E. Seybel, Treasurer." The bond and mortgage were never assigned to Fannie Clarkson or to her trustee, Seybel, but interest thereon was paid by Seybel's firm to Fannie Clarkson down to December 26, 1914.

When this certificate was issued it was pinned to the bond. The bookkeeper of Seybel's firm testified that when a mortgage was transferred in this way, it was the practice of the firm to have the Park Mortgage Company issue a certificate and pin it to the bond. He also testified that the various clients who dealt with the firm were aware of this practice and that they were told that their interests were being taken care of in this particular way and knew that the bonds and mortgages were held in the name of the Park Mortgage Company and not in any other name, one of the purposes of this practice being to evade the paying of personal tax.

On the books of the law firm there was an account entitled Daniel E. Seybel, trustee for Fannie Clarkson. This account carries the Noel mortgage and the various payments of interest made to Fannie Clarkson.

It thus appears quite conclusively that Fannie Clarkson conferred upon Seybel as her trustee power to sell the Noel bond and mortgage. It is quite true that the Park Mortgage Company did not make a formal assignment of the bond and mortgage to Seybel as trustee. It simply issued the certificate referred to. Nevertheless, Seybel controlled the situation and had the right under the deed of trust to him to adopt whatever method he pleased to sell the bond and mortgage for the

benefit of Miss Clarkson.   He made such a transfer by causing the Park Mortgage Company to execute and deliver an assignment of the bond and mortgage to Mary J. Alker under the following circumstances: Mary J. Alker had been a client of the law firm for several years and at one time had placed in the possession of the law firm about $50,000 for investment on her account.   On December 26, 1914, she had a balance of about $16,500 in the hands of the firm for investment and was entitled to this money at any time.

On the latter date, Seybel, as trustee of Fannie Clarkson, caused the bond and mortgage to be transferred to the account of Mary J. Alker, the Park Mortgage Company issuing a certificate to Mary J. Alker in form similar to that formerly issued to Daniel E. Seybel as trustee of Fannie Clarkson. At the same time, the account of Mary J. Alker with the firm was charged with the bond and mortgage and Seybel's account, as trustee of Fannie Clarkson, was credited with $6,000, the amount of the mortgage.   The parties stipulated at the trial that on the 26th of December, 1914, the firm of Seybel & French had in their hands uninvested funds of Mrs. Alker amounting to more than $6,000, part of which was the proceeds of a mortgage which had been paid off May 19, 1914. It was also stipulated that a finding to that effect be made by the court, and that finding was made.   Under the circumstances of this case it cannot be said that Seybel caused the Noel mortgage to be transferred to Mrs. Alker to pay an antecedent debt.   In March, 1915, Mrs. Alker decided to transfer her account from Seybel & French to the Union Trust Company.   Accordingly, a representative of the trust company called upon the firm and arranged to have the account turned over to the trust company.   At this time the Noel bond and mortgage was still in the name of the Park Mortgage Company, the evidence of Mrs. Alker's ownership thereof being the certificate issued by the mortgage company on December 26, 1914.   Thereafter, the Park Mortgage Company executed and delivered an assignment of the Noel bond and mortgage to Mary J. Alker and this bond and mortgage with other property was turned over to Mrs. Alker's representative and her account with the firm of Seybel & French closed.   It is claimed by the plaintiff, among other things,

that this assignment was without consideration and in fraud of the plaintiff's rights.

It thus appears that the plaintiff and Mrs. Alker stood in somewhat different positions with reference to the sale of the Noel bond and mortgage. In the first place, the sale was made possible by the plaintiff. There is no doubt that under the deed of trust to Seybel he had full power to make the sale to Mrs. Alker. Moreover, the plaintiff never took the trouble to ascertain if the bond and mortgage had been assigned to her trustee Seybel. The result was to permit the legal title to remain in the Park Mortgage Company, and she is properly chargeable with the consequences naturally flowing from this omission. One of the consequences was to permit Mrs. Alker to take the assignment of the Noel bond and mortgage directly from the Park Mortgage Company with no indication that it was trust property. There is nothing in the record to show that Mrs. Alker had any knowledge of any private arrangement between the plaintiff and Seybel, and when she took over the assignment of the bond and mortgage from the Park Mortgage Company there was nothing in the transaction to make her suspect that they were the property of the plaintiff or her trustee. Had she been made aware of that fact and then made an inquiry as to the power of the trustee to sell, she would have discovered that the plaintiff over her own signature had conferred full power upon the trustee to make the sale. Having made the inquiry, she would have met the full measure of her duty as a purchaser and would be protected in taking the assignment. (*Spencer* v. *Weber*, 163 N. Y. 493, 502.)

I think it is clear that Mrs. Alker was a *bona fide* purchaser of the bond and mortgage, without notice of any infirmity inherent in the transaction. It remains to inquire whether she gave any consideration for the assignment. The financial transactions with both Mrs. Alker and the defendant were carried on through the firm of Seybel & French, the latter giving the firm checks in settlement of income accounts with these clients.

When the Noel bond and mortgage were assigned to Mrs. Alker, she had on deposit with the firm for investment more than the amount of the bond and mortgage. Her account

with the firm was then charged with the amount of the bond and mortgage, and the account of Seybel, as trustee, was credited with $6,000. It may be contended that these were merely bookkeeping entries and were meaningless. It is nevertheless a fact that in banks, trust companies and other business houses, property is effectually transferred every day in this manner. And in the case at bar these entries had the effect of taking out of the account of Mrs. Alker a credit of $6,000, which, up to that time, had been subject to her call, and her account with Seybel & French was settled finally on that basis. The substance of the transaction was the payment by Mrs. Alker to the trustee of the plaintiff of the sum of $6,000 in return for the Noel bond and mortgage, she having at the time more than $6,000 on deposit with Seybel & French for investment.

For these reasons I think Mrs. Alker paid a valuable consideration for the assignment of the bond and mortgage and has a right to retain them as against the plaintiff.

The result arrived at would not be changed even if the trustee intended to commit a fraud in the transaction. The fraud, if any, was made possible and easy by the plaintiff's relinquishment of control over her property and by her failure to require that the bond and mortgage be held in the name of her trustee. Where one of two innocent parties must suffer through the fraud of a third party, he whose act made the fraud possible must bear the consequences. (*Yeoman* v. *McClenahan*, 190 N. Y. 121, 127; *Kirsch* v. *Tozier*, 143 id. 390, 395.)

Finally, Mrs. Alker's executor holds the legal title to the bond and mortgage in question and the case comes within the equitable doctrine referred to in Perry on Trusts (6th ed. § 218) where the author says: " And it may be added that nothing is clearer than that a purchaser for valuable consideration, without notice of a prior equitable right, obtaining the *legal* estate at the time of his purchase, is entitled to priority in equity as well as at law, according to the well known maxim that *where equities are equal, the law shall prevail.*"

The court has decreed that the $200 share of the Wright mortgage shall be assigned by the Park Mortgage Company

to the Dyckman executors, and that Fannie Clarkson recover of Seybel's executors $200.

Fannie Clarkson originally owned the $200 share in the Wright mortgage, but it was never assigned to her by the holder, the Park Mortgage Company, nor did the latter issue to her the usual certificate of ownership. It appeared, however, on the books of Seybel & French in the account of Seybel as trustee under date of December 1, 1911, as the property of Fannie Clarkson and she received the firm's check for interest thereon down to October 22, 1914. On October 22, 1914, Seybel, as one of the executors of Dyckman, bought the Wright mortgage, then reduced to $1,700, for the Dyckman estate, giving therefor a check for $1,748.45 drawn to the order of Seybel & French by himself as executor of Dyckman. This check was deposited in the firm's account and by entries in the firm's books the amount of the check was distributed among the accounts of those clients who appeared by the books to be owners of the participating shares of the Wright mortgage. Two hundred dollars were thus credited to the account of Fannie Clarkson as having been received from the executors of Dyckman. Entries were also made apportioning the interest then due. Thereafter interest on the Wright mortgage was paid to the Dyckman estate. It thus appears that the Dyckman executors gave full value for the share of Fannie Clarkson in the Wright mortgage, that they bought it from one upon whom she had conferred full power to sell and the transaction was carried through upon the books of Seybel & French in a manner with which she was acquainted and in which she must be held to have acquiesced.

The judgment of the Special Term should be affirmed, with costs.

LAUGHLIN, J., concurred; CLARKE, P. J., and SCOTT, J., dissented.

SHEARN, J. (concurring):

I agree with the opinion of Mr. Justice DAVIS with the exception of the statement therein "The fraud, if any, was made possible and easy by the plaintiff's relinquishment of control over her property and by her failure to require that

the bond and mortgage be held in the name of her trustee." In this particular I agree with Mr. Justice SCOTT that a *cestui que trust* is not " to be debarred from following property which her trustee has stolen or given away without consideration, merely because by appointing him trustee she put him in a position to defraud her." In my opinion the case turns upon the application of the maxim that where the equities are equal, the law shall prevail.

SCOTT, J. (dissenting):

I am strongly of the opinion that the judgment appealed from is wrong and should be reversed. It is one of the conceded facts in the case that the Noel mortgage, although held in the name of the Park Mortgage Company, was the property of James Clarkson, when he died and was allotted to Miss Clarkson, now Mrs. Behrmann, as a part of her share of his estate. When she executed the deed of trust to Seybel, the mortgage was transferred to him as a part of the trust fund and he thereafter held it as trustee.

Seybel went through the form of procuring a certificate of title thereto from the Park Mortgage Company, the record holder. If James Clarkson, the former owner, held an assignment from the mortgage company, it may be assumed that Seybel, who was both the executor of Clarkson and the trustee of plaintiff, surrendered the former certificate issued to Clarkson. At all events, however the details of the transaction were carried out, we may start with the trust deed to Seybel and the paper issued to him by the Park Mortgage Company. That paper deserves consideration. It is executed under the seal of the company, and certifies that it (the company) has " this day *sold* D. E. Seybel, as trustee for Fannie Clarkson, the bond of Leon Noel for six thousand dollars * * * secured by mortgage, covering premises 239 Van Cortland Park Avenue, Yonkers, N. Y." Then follows an agreement that the mortgage company will, on demand and the surrender of the certificate, deliver a formal assignment of the bond and mortgage such as could be recorded, or will, on like demand and surrender, execute and deliver a satisfaction piece.

By this instrument the Park Mortgage Company parted with all its beneficial interest in and all its actual title to the

First Department, July, 1917.                [Vol. 178.

debt evidenced by the bond and the mortgage given to secure it. The bond it had parted with absolutely, as its certificate states, and of course the right to the possession of the security followed the ownership of the debt, and after the completion of the transaction evidenced by its certificate the Park Mortgage Company had no title or interest in either the debt or the mortgage which it could lawfully sell or assign to any one, except D. E. Seybel as trustee, unless the certificate issued to him was surrendred and canceled as does not appear to have been done, or the debt, by some other means, retransferred to the mortgage company.

When, therefore, the Park Mortgage Company, later, undertook by a like certificate to sell the same bond to Mary J. Alker, it undertook to sell what it no longer owned, because it had already sold it to another person and had never reacquired it. On the face of the documents, therefore, without considering the relations of Seybel to the mortgage company and his domination of its business, Mrs. Alker never acquired any title to the Noel bond, because her only pretended title thereto was by a sale from a vendor who had already parted with all title to it and could not make a valid sale. The right to the mortgage, of course, followed the ownership of the debt, and as Mrs. Alker never acquired title to the bond, she had no right to an assignment of the mortgage, and the unauthorized formal assignment of the bond and mortgage to her by the mortgage company added nothing to her title, as between herself and plaintiff. But if we overlook, as was done at Special Term, the inability of the mortgage company to make a valid sale of that which it had already sold to another, and treat the transaction as if Seybel, as trustee, had transferred a part of the trust estate to Mrs. Alker, the judgment would still be wrong. The situation as it stood upon this theory was that Seybel as trustee held a mortgage for the benefit of his *cestui que trust*, and that he personally (or his firm which amounted to the same thing) owed Mrs. Alker some sixteen thousand dollars, which she had the right to call for at any time. He then proceeded to transfer, or cause to be transferred (if the transaction can be regarded as a transfer), the Noel bond and mortgage from himself as trustee to Mrs. Alker. No money passed. Nothing was given by Mrs. Alker, and

she apparently had no knowledge that the bond had been sold to her, for a considerable time afterwards. All that happened was that Seybel made some entries on his own books, reducing his indebtedness to Mrs. Alker by $6,000, and charging himself with a like sum as trustee. This was a typical instance of the operation commonly known as " robbing Peter to pay Paul," but it is well settled that in such a case Peter, if he can trace and identify his property, and Paul has not transferred it to a *bona fide* purchaser for value, may recover it from Paul. (*Newton* v. *Porter*, 69 N. Y. 133.)

It is sought, however, to uphold the transaction on the ground that by the terms of the deed of trust Seybel was authorized to sell and transfer any securities in which the trust fund might be invested. Undoubtedly the trust deed did give him the power, and if he had sold the Noel bond and mortgage to a *bona fide* purchaser for value, the sale would be valid even if he afterwards embezzled the proceeds. But the power to sell did not involve the power to steal or to give away, and as I view the transaction there was no sale, and no consideration. Indeed there was not even a semblance of a sale from Seybel as trustee to Mrs. Alker. Acting in the name of the mortgage company, Seybel sold the same bond twice, once to himself as trustee, and then to Mrs. Alker. The latter paid nothing and the trust estate received nothing, for the making of entries on Seybel's books without the knowledge of either Mrs. Behrmann or Mrs. Alker cannot be treated as a payment to or by either of them.

The situation of the parties as I see it is as follows: Seybel, as trustee for Miss Clarkson, received a bond and mortgage which had belonged to her father's estate. The record title stood in the Park Mortgage Company, but the actual title became vested in Seybel, as trustee, by virtue of an instrument executed by the mortgage company, which while not in such form as to be recorded, yet was amply sufficient as between the trustee and the mortgage company to vest the whole title to the debt and the right to the possession of the securities in the trustee. This bond and the right to the possession of the securities was never assigned to any one by the trustee, and he never received any money in consideration of such assignment.

The mortgage company, having no longer any title to or interest in the debt, undertook to make a second sale of it to Mrs. Alker, who paid no consideration for it, except that Seybel, without her knowledge, made an entry in his books apparently reducing his indebtedness to her, at the same time making a corresponding entry in his account as trustee.

In this transaction I can see none of the elements of a *bona fide* sale by Seybel, as trustee, to Mrs. Alker. On the contrary, I think that the title to the bond and the right to have the securities never passed out of Seybel, as trustee, and that the substituted trustee succeeded to the title and right. It is sought to strengthen the claim of Mrs. Alker's estate by the plea that Miss Clarkson, by creating the trust and appointing Seybel trustee, enabled him to commit a fraud on herself and Mrs. Alker. But her case is no different from that of Mrs. Alker who gave her money to Seybel for investment, and thus, on her side, enabled him to do what he attempted to do. I have never before heard it seriously argued that a *cestui qui trust* is to be debarred from following property which her trustee has stolen or given away without consideration, merely because by appointing him trustee she put him in a position to defraud her.

I think that the judgment should be modified by granting the relief prayed for by plaintiff respecting the Noel bond and mortgage for $6,000.

As to the $200 participation in the Wright mortgage the plaintiff's claim does not seem to be so clear, and as to that the judgment should be affirmed.

Under these circumstances the plaintiff should have costs of appeal only against the Park Mortgage Company and the executors of Seybel.

CLARKE, P. J., concurred.

Judgment affirmed, with costs.